### Case No. 1,195.

BEATTIE v. GARDNER et al.

[4 Ben. 479;[1]  4 N. B. R. 323, (Quarto, 106.)]

District Court, N. D. New York.  Jan. Term,
1871.

PREFERENCE—FRAUDULENT JUDGMENT — PROCUR-
ING OR SUFFERING PROPERTY TO BE TAKEN ON
LEGAL PROCESS.

1. Where a bankrupt had absconded from the
state, and four suits had been commenced
against him in a state court, by attachment of
his property, and publication of the summonses
had commenced, and the bankrupt thereafter
met one of his creditors and a lawyer who had
been and then was attorney for the bankrupt,
in Canada, at Niagara Falls, and the bankrupt
accompanied them to the American side of the
river, where the lawyer served upon him the
summonses and complaints in the four suits,
on which service judgments were thereafter
entered up and executions issued and levies
made, and then proceedings in bankruptcy were
commenced. and an assignee appointed, who,
after demanding the property levied on, filed a
bill in equity to set aside the judgments: *Held*,
that, on the facts, the bankrupt had procured
the property to be seized on the executions with
intent to give a preference to the creditors, and
that the judgments were therefore void under
the provisions of the 39th section of the bank-
ruptcy act [of 1867, (14 Stat. 536.)]

[Cited in Re Rainsford, Case No. 11,537;
Haskell v. Ingalls, Id. 6,193: Re Lord, Id.
8,503; Re Heller, Id. 6.337; Curran v.
Munger, Id. 3.487; Re Morse, Id. 9,852;
Re Jacobs, Id. 7,159.]

[2. Cited in Re Mallory, Case No. 8.991, to
the point that the district court of the United
States, sitting in bankruptcy, has power to re-
strain, by injunction, the sheriff of a state
court from proceeding to sell the property of a
bankrupt under an execution issued out of a
state court on a judgment obtained before the
commencement of the proceedings in bank-
ruptcy.]

3. An act which directly tends to defeat the
purposes and policy of the bankruptcy act,

[1] [Reported by Robert D. Benedict, Esq., and
here reprinted by permission.]

and which was done in contravention of and
with the intent to defeat such purposes and
policy, is, for that reason, fraudulent and void.

[Cited in Haskell v. Ingalls, Case No. 6,193;
Warren v. Delaware L. & W. R. Co., Id.
17,194.]

In equity.  This is a bill filed by the plain-
tiff, [Walter B. Beattie,] as assignee in bank-
ruptcy of Daniel Morse, an involuntary bank-
rupt, to set aside four judgments recovered
and docketed against the bankrupt on the
21st day of May, 1868, one of such judgments
being in favor of the defendant, Hiram
Gardner, and the other three being sever-
ally in favor of said Scoville, Harwood and
Stone, respectively.  The defendant Ransom
was the sheriff of Niagara county, who ·had
levied upon the real and personal property
of the bankrupt, by virtue of executions is-
sued on such judgments, on the said 21st
day of May, 1868, and who had advertised
such personal property for sale on the 27th
day of the same month.  On the 26th day of·
the same month, a petition in bankruptcy
was filed against Daniel Morse, the defend-
ant in such judgments, and an injunction
staying the sale so advertised was granted
by the bankruptcy court.  The plaintiff was
subsequently duly appointed and qualified as
the assignee of said Morse, and then, after
demanding possession of the property levied
on, filed his bill in this suit.  The defendants
having answered the bill, and the plaintiff
having replied to such answers, it was re-
ferred to one of the counsellors of this court
to take the proofs of the respective parties.
and to report the same, with his conclusions
of fact thereon.

The report of the referee states in sub-
stance, among other things, that the peti-
tion in bankruptcy against the said Daniel
Morse was filed at the time above stated,
and that an adjudication in bankruptcy, and

such other proceedings were had thereon that the plaintiff was duly appointed and qualified as his assignee; that thereupon all the estate, property, &c., of the bankrupt was duly assigned to him by the register in charge of the case; that on the 3d day of April, 1868, Morse committed the acts of bankruptcy charged in the bill, viz., that he did, on the 3d of April, 1868, depart out of and from the state of New York of which he then was and, for many years preceding that date, had been an inhabitant, with intent to defraud his creditors, and did on the same day, being a banker in the city of Lockport, in this district, fraudulently stop and suspend, and did not resume, payment of his commercial paper within a period of fourteen days; that after said bankrupt had so departed from the state, and on the said 3d day of April the defendants Scoville and Gardner, commenced their suits against him; that, on the 6th of the same month, the said defendant Harwood, and on the 18th of the same month the defendant Stone, commenced their suits against Morse; that such suits were commenced against the said Morse by summonses only, delivered to the sheriff of Niagara county, to whom attachments in the same cases were also delivered; that on and prior to the 18th of the same month the publication of the summons, as required by the New York Code, was commenced in each of said cases; that the sheriff attached the property of Morse under said attachments; that after leaving the state of New York, on the 3d of April, said Morse went to Detroit, and that, prior thereto, Phineas L. Ely, an attorney and counsellor at Lockport, had been, in some instances, the attorney and legal adviser of said Morse; that, prior to the 30th day of April, said Ely had had some correspondence with said Morse about appearing for him in the aforesaid actions, and had received from said Morse copies of the summonses and complaints in said actions, with a letter from said Morse, stating that the sheriff claimed to have attached in those suits all the household furniture in his house, and that he had two infant children, and directing said Ely to insist upon his exemption, under the New York statutes; that, in consequence of the receipt of said letter and papers, said Ely appeared in said actions for said Morse, for the purpose of protecting his right under the exemption laws; that, excepting as aforesaid, the said Ely had no authority to act for said Morse in said actions; that some time between the 3d and 30th days of April, 1868, said Ely arranged a meeting with said Morse, to take place on said last mentioned day, at Elgin, in Canada; that said meeting was to be held for the purpose of enabling said Morse to consult with said Ely and Judge Bowen, of Lockport, with reference to his children; that said Ely informed the attorneys for the plaintiffs in said actions that said Morse was or would be in Elgin as aforesaid, and

that he should try to have him come to Lockport; that one of the attorneys for said Harwood and Stone thereupon, and on the 29th or 30th day of April, 1868, gave to said Ely a copy of the summonses and complaints in the said actions of Harwood and Stone, to serve upon said Morse; that Elgin is situated upon the Canada side of the Niagara river, at the point where the Suspension bridge crosses said river; that said Hiram Gardner was one of the attorneys of said Scoville in his said action; that said Gardner informed said Ely that he would like to see the said Morse, and would go with him for that purpose; that on the 30th day of April, 1868, said Ely and said Gardner went to Elgin, and that while there said Gardner handed to said Ely a copy of the summonses and complaints in the said actions of Gardner and Scoville, for the purpose of having them served on said Morse; that, having finished their business at Elgin, the said Morse, Ely and Gardner left the hotel at Elgin, and walked across the bridge nearly as far as the American side of the Niagara river—the said Ely and Gardner being on their way home, and the said Morse accompanying them, at the request of the said Ely, for the sake of their society; that after reaching a point within the county of Niagara, said Ely served upon said Morse a copy of the summons and complaint in each of the aforesaid actions of Gardner, Harwood, Scoville and Stone against said Morse, and left the same with him; that up to that time the said Morse had had no notice of any of the aforesaid conversations had between the said Ely and the attorneys for the plaintiffs in said actions, or that it was the intention of said Ely to serve said papers upon him, and that he did not procure the service of said copies of said summonses and complaints to be made upon him; that the judgments entered in said actions were entered upon proof of the personal service of the summonses and complaints as aforesaid, and not by virtue of the publication of the summonses therein; that executions upon such judgments in favor of Scoville and Gardner were delivered to the sheriff on said 21st day of May, 1868, at 10:30 a. m., and in Harwood's and Stone's cases ten minutes later; that the real and personal property described in the bill of complaint constituted all the property of said Morse at the times aforesaid, and that he was indebted to other persons besides the plaintiffs in the said judgments and executions, in the sum of about twenty thousand dollars; that at the time of the personal service of said summonses and copies of complaints, and at the time of the seizure of said property upon said executions, the plaintiffs in said suits knew, or had reasonable cause to believe, that said Daniel Morse was then insolvent, and had committed the acts of bankruptcy alleged in the complaint; that such judgments were recovered upon bona fide debts

due from said Morse to said judgment creditors respectively; that the summonses in said actions of Gardner and Scoville were mailed to said Morse, at Detroit, on or about the 18th day of April, 1868; that the summons and copy of complaint in favor of Harwood was so mailed to him on or about the 10th day of April, 1868, and those in favor of Stone on or about the 21st day of April, 1868, and that there was, at the time aforesaid, and ever since has been, a regular communication by mail from Lockport to Detroit.

The referee also found, as conclusions of fact, from the facts before stated in his report (the most material of which are above stated), that the said Daniel Morse did not procure the service of the summonses and complaints which was made on the 30th of April, 1868, as aforesaid, with a view to give a preference to any of his creditors over his other creditors, or with the intent to procure his property to be seized, in violation or in fraud of the provisions of the bankruptcy act, but that such service was made without any procurement of the said Morse. He further found, as conclusions of fact, that at the time of the service of the summonses and complaints on said 30th day of April, 1868, as aforesaid, the said Gardner, Scoville, Harwood and Stone knew, or had reasonable cause to believe, that said Morse was insolvent, and that said service was made, and said suits were conducted, and the subsequent proceedings therein had, with the intent, on the part of said Gardner, Scoville, Harwood and Stone to obtain the payment of their debts in preference to the other creditors of said Morse, and that the said Morse did permit and suffer his property to be seized on the attachments and executions aforesaid, and a part thereof to be sold, but that such seizure and sale were not made by his procurement, and were made without any intent on his part to defeat or delay the operation of the bankruptcy act, or to prevent a distribution of his assets, as provided in said act.

To this report of the referee the plaintiff filed twelve exceptions, the most important of which relate to and oppose the findings, in substance, that the bankrupt did not procure the service of the summonses and complaints aforesaid, and did not procure his property to be taken on said executions, with intent to give a preference to the plaintiffs in such judgments, or to defeat the operation of the bankruptcy act.

On the hearing before the referee, Phineas L. Ely, before mentioned, was cross-examined as a witness for the plaintiff, and cross-examined in behalf of the defendants. He stated, among other things, that he had been in some instances the legal adviser of the bankrupt, and had, he thought, brought a suit for him within three months before the 3d of April, 1868; that he did not remember any consultation with him in regard to

his matters within the three months, except the commencement of such suit, until on or about the 3d day of April, 1868, and he thought the day previous, when he had a consultation with him as his attorney and counsel; that he was afterwards informed by Morse himself, that he would be at Elgin on the 30th day of April, 1868; that between the 3d and 30th of said month he knew that the actions of Gardner, Scoville, Harwood and Stone were commenced; that he communicated the fact that Morse was at Elgin to the attorneys for the plaintiffs in such actions on the 29th or the morning of the 30th of April; that he met Judge Holmes, one of the attorneys of Harwood and of Stone, and said to him that "Dr. Morse was at the bridge in Canada, that he (Ely) was going over to see Morse, and that if he desired to communicate with him he would take over any communication; that Holmes asked if he would take some papers and serve on Dr. Morse; that although he did not know that he replied, Holmes or his partner afterwards handed him the summonses and complaints in these actions of Harwood and Stone, and that he took them; that upon the 29th or 30th, he had an interview with Judge Gardner, (the plaintiff in one of said actions, and the attorney for said Scoville), in said Gardner's office; that he could not say how the conversation commenced, or whether Judge Gardner asked him where Morse was, or whether he (Ely) opened the conversation by telling him; that Gardner desired to see Dr. Morse, and said he would go with said Ely to the bridge, and did go; that either at Judge Gardner's office, or on their way to the bridge, Gardner handed him the papers in the cases of Gardner and Scoville, and requested him to serve them; that when he went to Elgin, he and Gardner went to a public house and found Dr. Morse there; that he thought they did not have an interview together, and were only in the room together, momentarily, when they first met there; that Gardner and Morse then had an interview at which he (Ely) was not present; that he then went into the room where they were, and all remained in the room until he and Judge Gardner left; that they were there from a half to three quarters of an hour; that Dr. Morse left the hotel in company with Judge Gardner and himself, and continued with them until nearly across the bridge; that when they got near the gate at this end of the bridge, he served the summonses and copies of complaint in all the four actions upon Morse, and then he and Gardner came home by the cars; that he could not say whether he appeared in any of the actions for Morse, but his impressions were that he did not; that he went voluntarily to Gardner and to Fitts (one of the attorneys of Harwood and of Stone, and the partner of Judge Holmes), and offered to serve the summonses and complaints.

On his examination in behalf of the de-

fendants he testified among other things that he learned in the first instance that Morse was to be at Elgin by telegram; that he never had any correspondence or conversation with Morse, or intimation from him that he was coming to Elgin for the purpose of being served in these suits, and never had any conversation with him about coming there or into the state for the purpose of being served with process; that Morse had not to his knowledge any knowledge or intimation that he was going to serve any papers upon him, or that he was about to give a preference to these creditors through any act of his; and that he did not act in the matter of serving these papers in pursuance of any understanding with him, or instructions from him. On his re-direct examination he stated that he found original notices of his appearance in behalf of Morse in each of the four suits, and did not doubt that copies were served on the plaintiff's attorneys respectively on the 20th of May, 1868. On his further cross-examination for the defendants, he stated that he thought he had had some correspondence with Morse about serving notices of appearance, and that such correspondence was before the 30th of April.

Judge Gardner's testimony in respect to the matter was very brief. He testified on his examination by the plaintiff's counsel, that he handed the summonses and complaints in the Gardner and Scoville cases to Mr. Ely, in the room in the hotel at Elgin; that Morse was in the room, but he could not say that it attracted his attention, and should rather think it did not. On behalf of the defendants he testified that there was no conversation about the papers, in which Morse participated; that in all his interviews with Morse no reference was made to these debts, papers, or suits, by Morse, or by Ely or himself in Morse's hearing to his knowledge or belief. On his re-examination on behalf of the plaintiff, he testified that his impression was that he made some remark to Ely when he handed him the papers; that soon after that something was said about his walking with Mr. Ely, and that they talked about Morse's financial condition.

The examination of the witnesses in the case, except Morse, the bankrupt, was ended on the 30th of December, 1869, and on the 19th day of January, 1870, Morse was examined de bene esse, on behalf of said defendants, before a United States commissioner in Minnesota, without notice to the plaintiff, and of course without any cross-examination in his behalf. He then and there deposed as follows: "My name is Daniel Morse. I am about fifty-five years of age; in April, 1868, I lived in Detroit, Michigan; I went from Detroit to the town of Elgin, in Canada, near the Suspension bridge, on business; I went to see Judge Levi F. Bowen, in regard to becoming the guardian of my children. I went of my own act, and without communication with any person in relation to going

there. I had an interview on or about the 30th day of April, 1868, with Phineas L. Ely and Hiram Gardner, at Elgin, and I also saw Judge Bowen there in reference to the guardianship of my children. I think Ely and Gardner came there in the evening. It was after dark. They came to the hotel where I was stopping. I saw Ely and Gardner when they first came together, perhaps not more than fifteen minutes. Mr. Ely remarked, I suppose you want to have a little conversation with Judge Gardner? I told him I did. Ely left the room and was gone, I should think, about half an hour, perhaps more. We sat there some little time after that, talking on general matters; no business subject that I remember of. Mr. Ely remarked to the judge, it was time for them to go or they would lose the train, and asked me to walk with them; I went nearly across the bridge with them, and, as I stopped to bid them good night, Mr. Ely took out certain papers which he handed to me. We then parted, they going on to the shore, and I returning into Canada. I had no object in going on the bridge with them, except Ely asked me to, and to be with them as long as I could. I had no intimation or knowledge that any papers were to be served upon me as I crossed the bridge. I did not know, before I examined the papers, what they were, or in what suit. I did not know at that time, nor had I any intimation that I was about to give preference to any creditor or creditors by any act of mine. I was never asked to come into the state of New York, and the jurisdiction of said court, for the purpose of being served with process, and I never had any communication with or from said Ely or any of the plaintiffs, their agents, or attorneys, or any other person or persons whatsoever, on that subject. No reference was made in the interview between Ely and Gardner and myself to the subject of these suits."

Farnell & Brazee, for plaintiff.
George Gorham, for defendants.

HALL, District Judge, (after stating the case as above.) It is obvious that the efforts of the parties upon the hearing before the referee, as well as on the hearing here, were mainly, if not wholly, directed to the single purpose of showing, on behalf of the plaintiff, that the case was within the express provisions of the 35th section of the bankruptcy act, and the judgments and executions of the defendants therefore void; and on behalf of the defendants, that the case did not fall within the provisions of that section. The finding of the referee upon the questions of fact deemed most material under these provisions, was adverse to the plaintiff; and as the case will be first considered in connection with such provisions, the evidence bearing upon these questions will first be discussed.

It cannot be doubted that the acts of Ely,

in informing the attorneys of the four principal defendants in this suit that Morse would be at Elgin, and offering to take and taking the summonses and other papers to serve upon Morse, and afterwards procuring the momentary return of Morse to the state of New York that he might serve such summonses upon him, and then serving the same, were intended on his part, as well as on the part of the attorneys who furnished him the papers, to give to these four defendants who had attached the property of Morse a right to enter judgments, issue executions, and seize his property thereon, in such manner as would secure to the plaintiffs in such executions a preference over the other creditors of Morse. Nor can it be doubted that if in so doing he acted with the assent and approval of Morse, so that his acts are in law to be regarded as the acts of Morse, the latter must be held to have procured his property to be seized on execution, so as to render the seizure illegal and void, under the express provisions of said 35th section.

In this view of the case, it becomes important to consider whether Ely was, in fact, so acting with the assent and approval of Morse, or was guilty of treachery to his client, in thus endeavoring to give preference to the defendants in this suit, and thus defeat the operation and effect of the provisions of the bankruptcy act.

In considering this question, and the general question whether Morse intended to aid in securing such preference to the defendants, it is to be observed that it would necessarily be the policy of Morse and Ely, as well as of the favored creditors, to proceed with the utmost caution, and, as far as possible, to avoid or conceal every act, declaration or proceeding which would furnish evidence to defeat their purpose. Their conversation and correspondence, and, as far as possible, their acts, would be regulated by this policy; and therefore, in respect to this question, their acts, their omissions to act, and their silence, are more significant than any express declaration of theirs, and must necessarily be most relied upon in determining the questions of Ely's authority and Morse's intentions.

The proof shows that Morse was a banker, and as he was also a doctor, he was doubtless an educated and intelligent person. On or before the 2d of April, 1868, he reached the conclusion that his hopeless insolvency required some action on his part, although it does not appear that, up to that time, his creditors had taken, or contemplated taking, any proceedings against him. Mr. Ely had before been sometimes consulted by him as his legal adviser, and had lately, or at least within three months, been employed by him to bring a suit in his favor. On the 2d of April, and in view of his insolvent condition, Morse again sought the counsel of Ely as his legal adviser. Their consultation was privileged, and what then occurred between them could not be given in evidence. The condition and circumstances of Morse, as shown by the evidence, would naturally lead to the obvious conclusion that the result of such consultation would be a determination on the part of Morse to apply for the benefit of the bankruptcy act, and secure a fair and equal distribution of all his property among all his creditors; unless he desired to give a preference to some or one of them over the others. If he desired to give such preference, Ely could inform him that the bankruptcy act would invalidate any act of his clearly intended to produce that result, and that to effect that object some measure must be taken by the creditors in which he (Morse) should not appear to co-operate. What occurred at this consultation can only be strongly suspected; for it is evident that no entirely reliable conclusion in regard to it can be based upon the then existing circumstances, and the subsequent conduct of the parties.

On the very next day, and possibly without being influenced by anything which occurred at such consultation, Dr. Morse absconded from Lockport; and before three o'clock in the afternoon of that day, the suits of Gardner and Scoville were commenced against him by the delivery of the summonses therein, and attachments against his property, although the publication of said summonses was not commenced until the 18th. It does not appear whether Ely or Morse had or had not communicated to these parties, or their attorneys, the fact of the intended or actual departure of Morse; but they were creditors that Morse or Ely, or both, then or subsequently, intended to prefer, and care was subsequently taken that their judgments should be docketed, and their executions issued, a few minutes in advance of those of Harwood and Stone, although the services on which the judgments were entered were all made at the same time. Indeed, this matter of preference, even between those four judgment creditors, seems to have been carefully regulated and guarded. Gardner was the favorite; Scoville came next, Stone next, and Harwood the last of all. Consequently, Gardner's judgment was docketed one minute before that of Scoville, so as to give him a preference as against Morse's real estate; that of Scoville half an hour before that of Stone; and that of Stone one minute before that of Harwood; and the executions in Gardner and Scoville's cases were delivered to the sheriff ten minutes before the executions in the cases of Stone and Harwood.

The levying of the attachments in these cases did not secure the desired preferences to these favored creditors as against proceedings in bankruptcy commenced within four months after such levy, although it was only by such proceedings that the lien of such attachments could be dissolved, and their object defeated. To fully secure a

preference, a levy on final executions on judgments obtained after personal service upon the defendant, or his appearance in the suits, was necessary; but a voluntary appearance, without such previous service, would, of itself, be almost certain to defeat the attempt to secure such preferences. This was doubtless well known to Ely and Morse, as well as to Gardner, and the attorneys of Harwood and Stone. Prior to the 30th of April, Ely had some correspondence with Morse about appearing for him in these suits, and had received the summonses which had been sent to Morse by mail; but this correspondence being privileged, its precise contents and exact purpose are unknown. But it is apparent that, for some reason, Ely decided not to appear in the suits, at least before personal service of the summonses upon Morse, and that his thoughts had been turned towards some other means of securing a preference to the parties who had prosecuted his unfortunate client. When this correspondence commenced, or when it ended, does not appear; but before the 30th of April, and probably before the 29th, Ely learned by a telegram from Morse himself, that the latter would be at Elgin on the 30th, although Morse swears that he went there of his own act, and without communicating with any person in relation to his going there. Ely then gave notice of that fact to the attorneys who had commenced the suits against Morse, and he procured from them, for the purpose of such service, the summonses which he subsequently served. Ely then went with Gardner, and met Morse at Elgin. It is assumed that he went there to consult Morse in reference to Judge Bowen becoming guardian for Morse's children; but it does not appear that he had any such consultation, or why it was necessary or desirable that he should have one. Ely left Gardner and Morse alone, almost immediatey after they met Morse; and although Gardner had, within the same month prosecuted Morse, and had attached his property in two suits which were yet pending, and there met him for the first time after such suits were commenced, it appears that these parties were careful not to speak of these suits, or either of them, during the half hour they were together. This silence can only be accounted for by the supposition that these parties understood each other, and deemed it most discreet, in view of their common object, to say nothing upon the matters apparently most likely then to be the subject of conversation unless there was some understanding that the matter was in the hands of Ely, and that it was not discreet to interfere with his plans and purposes.

The proof in reference to the alleged motive of Morse in coming momentarily into this state;—his yearning after the society of his Lockport friends, from whom he had been separated nearly a whole month, one of whom had in the meantime attached his property in two different suits, on the ground that he had departed from the state with intent to defraud his creditors, and had not mentioned this circumstance during their half hour's interview, and the other, his legal adviser, the day or day before he so departed, and who was there at his request as his legal adviser in respect to the guardianship of his children, but who was preparing, as it is alleged, in collusion with those who had prosecuted his client, and charged him with an intent to defraud his creditors, to effect a personal service of the summonses in those suits, so as to give such creditors a preference against the will of Morse· and the proofs in respect to the service upon Morse, and what then and there occurred,—have already been sufficiently set forth.

When these papers were served, Morse either knew, or by a single glance at them might easily have ascertained their character. Though served by his own attorney, he made no inquiry as to the meaning and purpose of such service, and manifested neither indignation nor surprise that his own attorney and confidential adviser should have thus lent himself to the opposing parties, and by treachery and trick had induced him to enter the state in order that he might consummate his alleged treachery. He does not appear to have made any effort to avoid the effect of such service, or to have expressed any dissatisfaction with the conduct of his attorney. He did not seek to avoid the effect of the service by voluntarily going into bankruptcy, nor did he give notice of this service to any other of his creditors in order that they might proceed against him in bankruptcy within the twenty days allowed for pleading; and he does not appear to have consulted with any one in regard to any measure to counteract the efforts of Ely, and of the creditors by whom he had been prosecuted.

He was not an ignorant man, unaccustomed to business, and he had consulted counsel upon other and recent occasions. It is assumed that he required the legal advice of Ely even in his consultation with Judge Bowen in regard to the guardianship of his children, and unless he was a willing participant in these proceedings, through Ely, his attorney, it is passing strange that he neither did, nor attempted to do, nor even said anything in disaffirmance or disapprobation of the conduct of Ely, nor consulted with any one in respect to the measures proper to be taken to defeat the purposes of those who had prosecuted him.

"Acta exteriora indicant interiora secreta;" the law judges of a man's previous intentions by his subsequent acts, (Broom, Leg. Max. 139;) "Omnis ratihabitio retro trahitur et mandato priori aequiparatur:" subsequent assent given to what has already been done has a retrospective effect, and is equivalent to a previous command, (Id. 380;) "Qui non pro-

hibet quod prohibere potest assentire videtur:" he who does not prevent that which he can prevent is held to assent, (2 Co. Inst. 308;) "Qui tacet consentire videtur:" silence implies consent, and such consent may be inferred from the parties' subsequent conduct, (Id. 360;) "Qui facit per alium facit per se:" he who does a thing by another does it himself, (Id. 373,)—are ancient, reasonable and well-established legal maxims, and may be properly applied in this case.

If the services made upon Morse on the Suspension bridge were brought about by the fraud and treachery of his attorney, acting in collusion with the attorneys of the opposite parties, and in opposition to the will of Morse, the supreme court, in which the actions were pending, would doubtless have set aside the services. Grah. Pr. (2d Ed.) 137; Williams v. Bacon, 1 Wend. 636; 2 Kent, Comm. 483, note b. Morse, by filing his own petition as a bankrupt, might have avoided the effect of such services; or he might, by communicating the facts to some of his other creditors, have enabled them to effect the same object by filing a petition against him during the twenty days allowed him to plead. But he did nothing of the kind, and seems to have rested in perfect contentment with the preference which he supposed Ely had secured to the four creditors who had prosecuted him.

In short, the conduct of Morse and Ely, before, and at, and after the time of the service of the summonses upon Morse, satisfies me that Ely was acting as the attorney and agent of Morse, without special instructions to do certain specific acts, but with the understanding and assent of Morse, that a preference should, in some way, be secured to these judgment creditors; Morse relying upon Ely to engineer the matter, and consenting to do what Ely requested. Ely, when he gave the information of Morse's expected visit to Elgin, and obtained the summonses, doubtless relied upon Morse's willingness to aid his purposes, and come momentarily into Niagara county, if he requested it, and he expected him to so act that these creditors, and no others, should obtain service of their process upon Morse.

The conclusions just stated, were resisted by the counsel for the defendants upon the ground that they were disproved by the testimony of Ely and Morse; and it was doubtless upon their testimony that the opposing conclusions of the referee were based. But their testimony does not fully meet the question, and is not, necessarily, a denial of what has been assumed. Their language seems to have been well considered, and what they have each sworn to in very nearly the same language, in respect to the service of the summonses, may be literally true, notwithstanding that Morse desired and intended that Ely should in some way secure the preference attempted to be given, and therefore accompanied Ely, at his request, until he reached the New York portion of Suspension bridge, to enable Ely to take such action as he desired to produce that result.

These views require a modification of the referee's report, but there is, perhaps, no necessity for a formal allowance of the exceptions. The second, seventh, eighth and tenth exceptions are, however, considered to be well taken, and as the allowance of these will correct the report so far as it may be necessary, the other exceptions may be considered as disallowed.

Of course, under the views already expressed, the plaintiff is entitled to a decree, but there is another and most important question involved in the case, upon which, in view of its great and general importance, I should probably have ordered an argument if the plaintiff had not been entitled to a decree upon other grounds.

It can scarcely be doubted that an act which directly and manifestly tends to defeat the purposes and policy of the bankruptcy act, and which was done in contravention of, and with the intention to defeat, such purposes and policy is, for that reason, fraudulent and void. "A fraudulent contrivance," said Lord Mansfield in Rust v. Cooper, Cowp. 629, "with a view to defeat the bankrupt laws is void, and annuls the act." And, in Foster v. Goulding, 9 Gray, 50–52, it was said by Thomas, J., after quoting the above language of Lord Mansfield: "This is well-settled doctrine, and, diligently and faithfully applied, would defeat most of the contrivances and indirections by which the just and equal operation of the insolvent laws is prevented." And see the cases cited by Judge Thomas, on page 53.

In this case the acts of Morse, upon which the attachments issued against him in favor of the defendants, were acts of bankruptcy under the bankruptcy act, and in the case of Shawhan v. Wherritt, 7 How. [48 U. S.] 627, Mr. Justice Grier, in delivering the unanimous opinion of the supreme court of the United States, said: "The chief and important question involved in this case is whether the appellants, after an act of bankruptcy, of which they had full knowledge, could, by proceeding in a state court, obtain a valid lien and seize the property of the bankrupt to the exclusion of his other creditors, or whether such a proceeding would not be a fraud on the bankrupt law, and therefore void."

In discussing that question he further said, among other things: "The acts thus enumerated (acts which were deemed acts of bankruptcy under the act of 1841, [5 Stat. 440]) are usually termed acts of bankruptcy, and may be considered as tests of insolvency, showing conclusively the inability of the trader to pay his debts, or carry on his trade. The policy and aim of bankrupt laws are to compel an equal distribution of the assets of a bankrupt among all his creditors.

Hence, when a merchant or trader, by any of these tests of insolvency, has shown his inability to meet his engagements, one creditor cannot, by collusion with him, or by a race of diligence, obtain a preference to the injury of others. Such conduct is considered a fraud on the act, whose aim is to divide the assets equally, and therefore equitably." Again: "A creditor may always recover and receive payment of his debt, or security for it, from his debtor, unless he has notice or knowledge that his debtor has committed an act of bankruptcy, and then he is forbidden to receive payment of his debt, or to obtain any other priority or advantage over the other creditors of the bankrupt. And if notice of this fact to the creditor makes a payment by the debtor void, it is obvious that a security or priority gained by a suit in a state court after such notice could have no better claim to protection, for notice of the act of bankruptcy to the creditor is the test of mala fides which vitiates the transaction."

In Shawhan v. Wherritt, the lien asserted was based upon the filing of a bill in equity against the bankrupt and his assignee under a voluntary assignment professedly made for the benefit of creditors, and a subsequent decree upon the bill so filed. The bill was filed on the 2d of May, 1842, and the petition in bankruptcy was not filed until the 24th of the next September. A decree in favor of the complainants in the state court was entered on the 22d of the succeeding month of October, and on the 4th of the next month the adjudication in bankruptcy was made in the bankruptcy court. The bill of the assignee in bankruptcy, under which the decision of the supreme court of the United States was made, was not filed until August, 1843. The bill was filed in the district court, and that court entered a decree in favor of the complainant. This decree the circuit court affirmed on appeal in November, 1844, [Shawhan v. Wherritt, Case No. 12,728,] and the decision of the circuit court was affirmed by the supreme court in 1849. The case was ably argued in that court, and the opinion of Mr. Justice Grier appears to have had the full concurrence of all the judges of that court.

The lien asserted in that case was based upon proceedings in equity, and the liens asserted in this case are based upon proceedings at law. That case arose under the act of 1841, and this under the act of 1867. But I have not been able to discover, in the reasoning of Mr. Justice Grier, or in the somewhat different language of the two acts, any ground for assuming that the liens insisted upon in this case are not void under the decision made in the case of Shawhan v. Wherritt. Indeed, the learned judge of the southern district of New York, in his well-considered opinion in the Case of Black and Secor, [Case No. 1,457,] applied the doctrine of Shawhan v. Wherritt, in a case where the creditor had obtained a judgment, execution

and levy by the neglect of the bankrupt to file a voluntary petition in bankruptcy, and he declared that the doctrines of Shawhan v. Wherritt, held to be applicable to the act of 1841, are much more applicable to the act of 1867. The Case of Black and Secor is, in fact, an authority in point against the defendants, and there are other cases which tend to support the same doctrine. In re Belden, [Case No. 1,240;] In re Black and Secor, [Id. 1,458;] Fitch v. McGie, [Id. 4,835;] In re Wells, [Id. 17,388.]

The plaintiff will have a decree in accordance with this opinion.